SIDNEY SPITZER & CO. v. COMMISSIONERS OF FRANKLIN COUNTY.

(Filed 21 June, 1924.)

**1. Highways—Road Districts—Counties—Statutes—Sinking Fund—Mandamus.**

It is peculiarly within the province of the Legislature, in authorizing a local road district within a county to require that the county commissioners levy a special tax, in conformity with the organic law on the subject, to provide for the interest and principal on the bonds to be issued therefor as they may become due and payable; and where the statute has so provided, whether the appropriation to the payment of the principal be called a sinking fund or not, the effect is the same, and it must be pursued, or otherwise a mandamus against the county commissioners will lie. *Cooper v. Comrs.,* 183 N. C., 231, overruled.

**2. Same—Stare Decisis—Appeal and Error—Second Appeal—Rehearing—Rules of Court.**

The doctrine of *stare decisis* has no application, especially when no rule of property is involved, when it clearly appears that error has been committed in the decision of the former case by the Supreme Court; and where the exceptions present, on the second appeal, under different and somewhat similar statutes, the question as to whether a mandamus will lie for the failure of the county commissioners to make a special levy for

the payment of the principal of the sinking funds for road bonds of a certain district, and the Supreme Court has erroneously decided that it was unnecessary as to another road district within the same county, on the appeal in the later case the position is untenable, that it was an attempt to obtain a rehearing contrary to the rules on the subject.

CLARKSON, J., concurring.

APPEAL by plaintiff from *Calvert, J.,* at August Term, 1923, of FRANKLIN.

Application for writ of mandamus, heard upon facts admitted in the pleadings; and from a judgment denying the writ, plaintiff appeals.

*William H. & Thomas W. Ruffin, and J. L. Morehead for plaintiff. S. A. Newell for defendants.*

STACY, J.   In this action, or proceeding, plaintiff makes application for a writ of mandamus to compel the defendants, commissioners of Franklin County, by order of court, to lay and collect a special tax annually of not less than 25 cents and not more than 75 cents on the $100.00 assessed valuation of all property subject to taxation within the limits of Harris Township, Franklin County, for the purpose of paying the interest, as it accrues, upon certain road bonds, and to provide a sinking fund to pay the principal of said bonds at maturity, as required by the following provisions in chapter 74, Public-Local Laws 1919, as amended by chapter 40, Public-Local Laws, Extra Session 1920, under which the bonds now held by plaintiff were issued and sold by the defendants:

"That for the purpose of providing for the payment of said bonds and the interest thereon, and for the construction, improvement and maintenance of the roads of said township, the board of county commissioners of said county shall, annually, and at the time of levying the county taxes, levy and lay a special tax on all persons and property subject to taxation within the limits of said township, or not less than twenty-five cents and not more than seventy-five cents on the one hundred dollars assessed valuation of property," etc.

Plaintiff is the purchaser and holder of bonds issued by the defendants in 1919 and 1920, under and by virtue of elections held in Harris Township, Franklin County, as authorized by the two acts above mentioned; and the defendants duly levied a tax in 1920 and 1921, sufficient in amount and within the limits fixed by the statutes for the purposes now in question, but in deference to the decision of this Court in the case of *Cooper v. Comrs.,* 183 N. C., 231, they have now declined to levy a greater tax than is necessary to meet the interest on said bonds as it falls due.   The court below placed its judgment upon the recent

decision of this Court in the *Cooper case,* and declined to grant the relief sought, and dismissed plaintiff's petition or application for writ of mandamus. It is conceded that if the *Cooper case* is to be followed, the judgment below must be affirmed; otherwise not.

There is no doubt as to the validity of the bonds held by plaintiff; they are not in dispute. The single question presented by the appeal is whether the defendants may be required by mandamus to lay and collect an annual tax, sufficient in amount *not only to pay* the interest on said bonds as it becomes due, but also to provide for the payment of the principal of the bonds at maturity. This would seem to be the plain meaning of the statute, and the contrary holding in *Cooper v. Comrs.,* 183 N. C., 231, is disapproved.

Much was said on the argument in favor of adhering to this recent decision, but the doctrine of *stare decisis* is not to be observed with inflexible strictness, especially where no rule of property is involved, and it should never be employed to perpetuate an error. 15 C. J., 956; *Lowdermilk v. Butler,* 182 N. C., 502. "The rule of *stare decisis* is entitled to great weight and respect where there has been, on a point of law, a series of adjudications all to the same effect; but when we are presented with a single decision which we believe to have been inadvisedly made, it is encumbent on us to overrule it if we entertain a different opinion on the question submitted." *Morphy, J.,* in *Griffin v. His Creditors,* 6 Rob. (La.), p. 228. There is no virtue in sinning against light or in persisting in palpable error, for nothing is settled until it is settled right. To quote the late *Chief Justice Clark,* "There should be no blind adherence to a precedent which, if it is wrong, should be corrected at the first practical moment." Indeed, the doctrine of *stare decisis et non quieta movere* has been quite accurately and correctly stated, as follows:

"A deliberate or solemn decision of a court or judge, made after argument on a question of law fairly arising in a case, and necessary to its determination, is an authority, or binding precedent, in the same court or in other courts of equal or lower rank, in subsequent cases, where 'the very point' is again in controversy; but the degree of authority belonging to such a precedent depends, of necessity, on its agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law, and the compulsion or exigency of the doctrine is, in the last analysis, moral and intellectual, rather than arbitrary or inflexible."

In the well-considered case of *Jones v. Comrs.,* 137 N. C., 579, fortified, as it is, by numerous authorities cited therein, it was held that where the Legislature had passed an act authorizing and empowering a county to fund its existing indebtedness, incurred for necessary expenses,

by issuing bonds therefor, mandamus was the proper remedy to compel the county commissioners to issue the bonds as required by the act of the Legislature. Here, we think, the act sought to be enforced is clearly mandatory. The commissioners are required to levy a special tax, *annually,* within the limits specified in the act, for the purpose of providing for the payment of said bonds and the interest thereon. This language admits of but one construction, and, in our opinion, the plaintiff has a clear legal right to demand that the provisions of the statute be observed. *Person v. Doughton,* 186 N. C., p. 724, and cases there cited.

It can make no difference whether the statute contains an express designation of a sinking fund or not; it provides for the annual levy and collection of such special taxes as may be necessary to meet "the payment of said bonds and the interest thereon." This language is sufficiently explicit to require no judicial interpretation. It imposes a duty on the county commissioners to levy *annually* a special tax, within the limits fixed by the statute, for the purpose of providing for the payment of said bonds and the interest thereon.

What other meaning can this language have? Call it a sinking fund, or what not, the command of the Legislature is that, if the bonds are sold, provision shall be made for their payment by levying an annual tax, sufficient in amount to meet the interest as it falls due, and to pay the bonds at maturity. It is not for us to say that some future generation should pay for the roads built and enjoyed by the present generation. The question before us is, What provision has the Legislature made for the payment of these bonds? The lawmaking body, in our judgment, has spoken in unequivocal terms. The commissioners of Franklin County are directed to levy each year a tax sufficient to pay the interest on said bonds as it becomes due, and to provide for a sum sufficient to retire the bonds at the maturity. *Spruill v. Davenport,* 178 N. C., 364; *Manly v. Abernethy,* 167 N. C., 220; *Comrs. v. Henderson,* 163 N. C., 114; *Asbury v. Albemarle,* 162 N. C., 247. This necessarily implies the laying aside periodically of a sum which, when invested at interest and when the interest is added to the annual payments, will amortize the bonds at maturity. Such a fund is usually called a sinking fund. But if the name be distasteful, let it be nameless, as the Legislature has chosen to leave it without a name in the present statute.

It is suggested that this appeal is simply an attempt to secure a rehearing of the *Cooper case,* which is now *res adjudicata.* We do not so understand the record. The *Cooper case* dealt with a special levy for roads in Sandy Creek Township, Franklin County, made under chapter 173, Public-Local Laws, 1919. The present case deals with a

3—188

special levy in Harris Township, Franklin County, authorized by chapter 74, Public-Local Laws, 1919, as amended by chapter 40, Public-Local Laws, Extra Session, 1920. The two acts are separate and distinct. True they contain similar provisions with respect to the levying of a special tax, and in each it is required that the board of county commissioners *shall annually levy and lay a special tax,* in the designated township, for the purpose of providing for the payment of the road bonds issued in connection with the building of the roads in said township and for the payment of the interest thereon. This is the extent of their similarity; they relate to different things and are wholly disconnected. The doctrine of *res adjudicata* has no application to the instant facts and is foreign to the case.

In *Hicks v. Cleveland,* 106 Fed., 459, it was held that where the Legislature of a State has authorized a municipality to issue bonds, and provided in the same act for the annual levy of taxes to pay the interest thereon as it accrues and the principal at maturity, such provision becomes a part of the contract on the issuance of the bonds, and may not be repealed by subsequent legislation unless some other adequate method is substituted in its place; and a Federal court which has rendered a judgment against the municipality on such bonds or their coupons may compel the levy of a tax for its payment by mandamus. *Simonton, Circuit Judge,* delivering the opinion, took occasion to observe: "The provisions of law existing at the time of issuing the bonds, providing for a tax, form a part of the contract, which cannot be impaired by any subsequent law. *Butz v. City of Muscatine,* 8 Wall., 575; 19 L. Ed., 490. Where at the time of issuing said bonds there existed an act authorizing an annual tax for their payment, it was beyond the power of the Legislature to repeal it, so far as concerned the bonds in question, unless some other adequate remedy was substituted in its place. *City of Galena v. Amy,* 5 Wall., 705; 18 L. Ed., 560."

To like effect is the decision of the United States Supreme Court in the case of *East St. Louis v. U. S.,* 120 U. S., 600; 30 L. Ed., 798, where *Chief Justice Waite,* delivering the opinion of the Court, said:

"The judgment is for interest in arrear and a small amount of principal. The law required a tax to be levied annually, sufficient to pay all interest as it accrued, and the principal when due. This was neglected, and consequently there is now a large accumulation of debt, which ought to have been paid in installments. Thus far the inhabitants have been allowed to escape taxation at the time it ought to have been made, and to which they were under constitutional obligations to submit. The accumulation of the debt was caused by their own neglect as members of the political community which had incurred the obligation. Such being the case, we see no reason why it was not in the power of the court to order a single levy to meet the entire judgment, which

was all for past-due obligations." See, also, *Holt County v. Nat. Life Ins. Co.,* 80 Fed., 686, and *Darlington v. Atlantic Trust Co.,* 78 Fed., 596.

The wisdom or impolicy of providing "sinking funds" for the payment of bonds at maturity is not a matter for us to decide. This is a legislative and not a judicial question. One of the outstanding features of the legislation under which North Carolina is building and financing her State highways is the fact that a sinking fund has been provided for the payment of the road bonds which, like other funds for highway construction and maintenance, is derived from a source that does not impose any direct tax on the people of the State and which at the same time affords a certain income. Under the provisions of chapter 188, Public Laws of 1923, there is set aside an annual fund of $250,000 from the revenue derived from the 3-cent tax on gasoline and from the revenue on motor vehicle licenses, and in addition, $250,000 is to be drawn from the general fund of the State Treasurer, making a total annual sinking fund of $500,000 for retiring the highway serial bonds. Besides this fund, which is specifically set aside, any surplus which remains from the above-mentioned revenue after deducting the interest on outstanding highway bonds, cost of maintaining the State Highway System, and the operating expenses of the commission, reverts to a sinking fund for the retirement of outstanding bonds issued for purposes of highway construction.

In the *Cooper case,* 183 N. C., p. 235, the quotation, "Without legislative authority a sinking fund could not be created," ostensibly taken from *Hightower v. Raleigh,* 150 N. C., 571, is not an exact quotation from the opinion in the *Hightower case.* In that case the Court said: "Without legislative authority a special tax could not be levied or a sinking fund created." The authority to levy a "special tax," where no special tax has been authorized, was the question involved in that case. In the reference there made to the creation of a sinking fund, the Court said, and intended to say, that no special tax, where none had been authorized, could be levied for a sinking fund. It did not mean to say, for the question was not presented, that moneys could not be appropriated annually into a sinking fund if there were surplus sums which could be used for such purpose. "Every opinion, to be correctly understood, ought to be considered with a view to the case in which it is delivered." *Marshall, C. J.,* in *U. S. v. Burr,* 4 Cr., 470.

In *Gastonia v. Bank,* 165 N. C., 507, it was held that, although there was no provision of law for a special levy of taxes to pay the interest and to create a sinking fund, nevertheless the city did have the power to pay the interest and create a sinking fund for the bonds if the general revenue derived under the limit fixing its taxing power was sufficient to do so. Indeed, the authority to levy a special tax annually to be

applied to the payment of the principal and interest of a public debt, such as is contained in the statute now before us, comes within the very definition of a "sinking-fund tax." A sinking fund is defined to be a fund derived from particular taxes, imposts, or duties, which is to be appropriated toward the payment of the interest due on a public loan and for the payment of the principal. 36 Cyc., 460; 7 Words and Phrases, 6522. The object of every sinking fund is to diminish the debt whose existence warranted its foundation. *N. Y. Sav. Bk. v. Grace,* 102 N. Y., 313. And "a 'sinking-fund tax' is a tax raised to be applied to the payment of the interest and principal of a public loan." *U. P. R. R. Co. v. Buffalo Co.,* 9 Neb., 449.

The only valid tax authorized to be levied by the present statute is an annual tax of not less than 25 cents nor more than 75 cents on the $100 assessed valuation of property. Unless provision is made, as contemplated by the statute, the county will not be in position to pay these bonds at maturity out of the funds derived from the tax now being levied. In *Proctor v. Comrs.,* 182 N. C., 60, it was said: "The authority to issue bonds or to pledge the faith and loan the credit of a subordinate political subdivision of the State is limited by its ability, under the law, to provide for the ultimate payment of said obligations." And further, it is the accepted position with us that where bonds are issued or other acts done, under special sanction of legislative authority, the statutory provisions on the subject are controlling. *Comrs. v. Webb,* 148 N. C., 120; *Robinson v. Goldsboro,* 135 N. C., 382.

In dismissing plaintiff's application for writ of mandamus, the learned judge of the Superior Court who heard the case below placed his judgment squarely upon the decision of this Court in *Cooper v. Comrs., supra,* which contained our latest expression on the subject. In this he was right; but, after earnest reflection, we are convinced that the *Cooper case* must be overruled, and this necessarily carries with it a reversal of the judgment of the Superior Court, entered in the present case.

Error.

CLARKSON, J., concurring. I was not a member of this Court when the case of *Cooper v. Comrs.,* 183 N. C., 231, was decided.

The section of the statute under consideration (Public-Local Laws 1919, ch. 74, sec. 10) is as follows:

"That for the purpose of providing for the payment of said bonds and the interest thereon, and for the construction, improvement and maintenance of the roads of said township, the board of county commissioners of said county shall annually, and at the time of levying the county taxes, levy and lay a special tax on all persons and property subject to taxation within the limits of said township, of not

less than twenty-five cents and not more than seventy-five cents on the one hundred dollars assessed valuation of property," etc.

The statute could have been more explicit, as they usually are, in regard to creating a "sinking fund," but I think it is sufficient and concur in the interpretation given it. The mandate of the Legislature must be followed, whatever may be the individual view as to the evil of sinking funds. I do not think it amiss to state that I heartily agree with the late lamented *Chief Justice Walter Clark* as to his view in reference to sinking funds:

A "sinking fund is not essential to the validity of the bonds, and indeed was unheard of until suggested by Sir Robert Walpole, whose name recalls neither peculiar financial ability nor political honesty. He was the man who originated the expression 'Every man has his price.' Something over a century and a half ago he originated the sinking fund idea also, and procured Parliament to adopt it by suggesting that it would aid in securing better prices for the bonds. But in twenty years he procured another act perverting the sinking fund to his own use for other purposes. A half century later Pitt revived the idea of a sinking fund as an alluring hope for the extinguishment of the public debt by financial legerdemain. But the result was so unsatisfactory that the experiment was abandoned finally by the British Parliament in 1829 and has been ever since a condemned experiment. Browne on Sinking Fund.

"Sinking funds have so often become, as this Court has heretofore said, 'a sunken fund,' that they have become much discredited, and Massachusetts, and probably other States, have a provision prohibiting them. Bouvier Law Dictionary, Sinking Fund.

"There has been no sinking fund authorized in England since 1829, as already stated, and only once has a statute of the United States authorized a sinking fund for any part of our indebtedness, and that was allowed to become a dead letter until at the instance of Mr. Boutwell, then Secretary of the Treasury, it was repealed. It is a device which in practice has not proven successful and is considered by financial writers not advisable.

"Financial writers in works on the subject all point out that the sinking fund has not proven successful. If a pro rata part of the principal is to be collected each year it is conceded that the simplest and safest way is to issue serial bonds and pay one each year. There is no risk in this, whereas, with a sinking fund, the instances in which the fund has been diverted have been notoriously numerous. If a sinking fund is invested in other bonds of the debtor it can be no additional security to the creditor, for it is just the same paper, and if it is composed of purchases of other bonds the fund may be lost by one reason

or another and has very frequently been appropriated by later legislative action to other purposes. These increase the burden on the taxpayers without any real benefit to the bondholders."

"Provision for the payment of public debt is sometimes made by the establishing of a sinking fund. A sinking fund contemplates the gradual extinction of a debt, provided by the law authorizing the debt, and while it has been discarded in the practice of the more advanced nations, is sometimes used by the nations of weaker credit." New Inter. Ency., Vol. 7, p. 382—Finance.

In the opinion of *Mr. Justice Stacy,* in reference to the Legislature creating a sinking fund for retiring the highway serial bonds, chàpter 188, Laws 1923, it is expressly provided in the act how the sinking fund is to be invested, as follows:

"That moneys in the sinking funds herein shall not be loaned to any department of the State, but shall be invested by the State Treasurer in bonds of

(*a*) The United States;

(*b*) The State of North Carolina;

(*c*) Bonds of any other State whose full faith and credit are pledged to the payment of the principal and interest thereof;

(*d*) Bonds of any county, city, town, township or school district of North Carolina which are general obligations of the subdivision or municipality issuing the same, and for the payment of which, both principal and interest, there is no limitation of the rate of taxation;

(*e*) Bonds of any county having population of thirty thousand or more by the last preceding Federal census and of any city having a population of twenty thousand or more by such census, in any State of the Union, which are general obligations of the county or city issuing the same, and for the payment of which, both principal and interest, there is no limitation of the rate of taxation."

Section 6 goes further into detail.

Every safeguard is put around the investment of the sinking fund. The vice complained of by the late *Chief Justice* in the *Cooper case* was that the act was too confined in scope and did not in language create the sinking fund or provide for a sinking fund in plain language, or how the sinking fund should be invested to save it from being a "sunken fund." It will be noted that the act providing for the State Highway sinking fund, *supra,* was an emergency act. The State Highway System Road Act, Laws 1921, ch. 2, part of sec. 39, provides for serial bonds, etc., and is as follows:

"The State Treasurer is hereby authorized, empowered, and directed to issue and sell serial bonds of the State, payable in not less than ten nor more than forty years from the date of issue, and aggregating," etc.

The extraordinary large and unexpected fund realized from the automobile and gasoline tax made this sinking fund imperative until the *serial highway bonds* commenced to mature. Therefore the act of 1923, *supra,* was passed. The original idea of the Legislature, no doubt, was that it would take ten years to complete the then contemplated road program, and the serial bonds were issued to commence to mature in ten years and would be thirty-year serial bonds. The policy of the Legislature was to provide for State Highway serial bonds, not a sinking fund.

The Municipal Finance Act, C. S., ch. 56, subsec. 3, and amendments thereto, its purpose is serial bonds, and the determining period for bonds to run is the probable period of usefulness of an improvement or property for which the bonds are issued.

The new school laws, ch. 136, Public Laws 1923, Part 8, part of sec. 258, is as follows:

"The bonds shall be serial bonds, and each issue thereof shall so mature that the aggregate principal amount of the issue shall be payable in annual installments or series, beginning not more than three years after the date of the bonds of such issue, and ending not more than thirty years after such date."

So could be cited other legislative acts showing that the policy of the legislative branch of the Government representing the popular will is that when these undertakings for the betterment of all the people are undertaken, and a debt created for such as schools, roads, water supply systems, sewer systems, etc., that these investments for the benefit of the public should be paid back so much each year until the indebtedness is discharged. This is safe public and private financing.